NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0099n.06

No. 09-1941

**FILED**
**Feb 10, 2011**
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

        v.

RICARDO VARGAS,

    Defendant-Appellant.

On Appeal from the United
States District Court for the
Eastern District of Michigan

_____/

**Before:**    **GUY, BOGGS, and GIBBONS, Circuit Judges.**

**PER CURIAM.**    Defendant Ricardo Vargas was convicted of five counts following a joint trial with his codefendant Geretha Lee: (1) conspiracy to import a controlled substance; (2) conspiracy to possess with intent to distribute a controlled substance; (3) importation of a controlled substance, aiding and abetting; (4) possession with intent to distribute a controlled substance, aiding and abetting; and (5) attempted possession with intent to distribute a controlled substance. The jury found as to each count that the offense involved not only 3,4 methylenedioxymethamphetamine (also known as MDMA or ecstasy), but also 500 grams or more of a mixture containing a detectable amount of methamphetamine. Defendant was sentenced to concurrent terms of 240 months' imprisonment on each count. Vargas challenges the sufficiency of the evidence to support

his convictions, argues that it was error to find that he was subject to mandatory minimum sentences, and claims the district court abused its discretion by imposing a two-point leadership enhancement under U.S. Sentencing Guidelines Manual (USSG) § 3B1.1(c). For the reasons that follow, we affirm.

## I.

On May 17, 2008, at approximately 11:30 p.m., Vargas's codefendant and girlfriend Geretha Lee was stopped by customs officials as she entered the United States by car through the Detroit-Windsor Tunnel. Lee, who lived in Indianapolis, said she had come by herself to vacation in Detroit, did not have a place to stay, and had spent the last five hours at the casino in Windsor. When a check of Lee's identification showed an outstanding warrant from New Mexico, Lee was removed from the Chrysler 300 she was driving for questioning. Lee explained that her identity had been stolen by someone in New Mexico. The authorities in New Mexico declined to extradite her, and the warrant was later quashed.

The secondary search of the car, however, resulted in the discovery of marijuana seeds and stems on the floor of the passenger area. There was also a strong "masking" odor that customs officers found suspicious. A drug-detection dog alerted to the dashboard on the passenger's side, and a further search revealed a package containing more than 6,000 pills in three bags hidden in the space behind the glove compartment. The pills, shaped and marked like ecstasy or MDMA, were estimated at trial to be worth between $48,000 and $91,000. It was stipulated that the three bags weighed 620 grams, 617.2 grams, and 605 grams, respectively, and held 1,964, 2,061, and 2,058 tablets, respectively. Also, while the

tablets in the first bag contained both methamphetamine and MDMA, the tablets in the second and third bags contained methamphetamine and only traces of MDMA.

By 11:45 p.m., agents had been summoned to interview Lee and solicit her cooperation in making a controlled delivery. Lee initially said she had driven her car, then acknowledged that the car had been rented in her mother's name. She added that Vargas had sent her $230 for the rental by way of a Walmart "money gram," and the receipt identifying Vargas as the sender of the "money gram" was in Lee's purse. Lee gave several reasons for coming to Detroit, and then said she had driven her friend Monique to Windsor so she could engage in prostitution. Customs officers had suspected a Monique Miles of importing drugs, and determined that Miles had entered the United States through the tunnel not long after Lee had attempted to cross the border. After Lee was confronted with the discovery of the pills, Lee admitted that she had met Monique earlier that day in Michigan City, Indiana, and had agreed to drive to Canada and bring back pills for Monique's boyfriend. Lee told the agents that she was supposed to meet Monique somewhere along the river in downtown Detroit, and agreed to try to find the meeting place and set up a controlled delivery.

Lee identified a CVS drugstore, and agents put a small package of pills in the glove compartment of the car Lee had been driving. Lee's cell phone had been ringing throughout the interviews, including calls that she said were from Monique. The agents had Lee tell Monique that she was at the IHOP and had parked the car at the nearby CVS. The agents parked the car at the CVS and began surveillance. Roughly 20 minutes later, at 2:40 a.m., Lee received a phone call on her cell phone from someone who sounded male. Minutes later,

Vargas was spotted walking along the street toward the CVS. Lee denied knowing Vargas, who went into the CVS briefly, came out, opened the passenger car door, and leaned inside the car. He did not get in, but pulled himself out of the car, closed the door, and was arrested as he attempted to walk away. Inside the car, agents discovered that the glove compartment had been opened. Vargas told officers that Lee had dropped him off at a bar in Detroit's Greektown, and he later decided to follow a crowd walking down Jefferson Avenue where he happened upon Lee's car.

Lee, who did not want Vargas to see her, was taken back to the customs offices and asked to make a written statement before she could go home. The narrative, written in Lee's hand, stated:

> I Geretha Lee is giving this statement confirming that Monique Miles asked me to go to Canada for her boyfriend to pick up extacy [sic]. She was to meet me after picking-up the extacy [sic]. She called me on my cell phone but I could not hear her phone was hanging-up or she was hanging-up on me. When I found out about the extacy [sic] she called me + asked me about my location. She had Ricardo [Vargas] wire me money.

Lee was released that night, but was later charged along with Vargas.

At their joint trial, Lee testified on her own behalf. Vargas, who had prior convictions, did not. There was evidence that Vargas was unemployed, did not have a driver's license, and had been living with his sister Marcela Martinez in an apartment in Hammond, Indiana. Lee was employed, had four children, and was living with her mother in Indianapolis, Indiana. Lee met Vargas at a nightclub a year earlier and had been spending alternate weekends with him at his sister's apartment.

Lee disavowed her written confession, and claimed instead that she had been duped by Vargas into bringing the pills into the United States without her knowledge. As she now explained, Vargas had suggested that they get away for the weekend to Detroit, mentioned that she should bring a birth certificate, and insisted that she rent a car—specifically, a Chrysler 300—because her truck used too much gas. Vargas sent her $230 to rent the car, and Lee rented the car in her mother's name because she did not have a checking account. Lee went to get Vargas in Gary, Indiana, and they stayed overnight in a hotel. The next day, Vargas drove as far as Michigan City, Indiana, where he made an unexpected stop at an apartment complex to meet with Monique Miles. Lee said she had met Miles only a few times, and had been told that she would have sex for money. Lee said she waited in the car, then drove the rest of the way to Detroit while Vargas smoked marijuana in the passenger seat.

Lee testified that once they got to Detroit, Vargas met with Miles and told Lee that he had some business to take care of without her. Lee claimed that she had tried to remain ignorant of his "business," and interrupted him when he started to tell her about Miles. Lee said that Vargas gave her $250 and told her to go to the casino in Windsor, park on the fourth floor of the structure, and stay at the casino until he called her. Lee did exactly that. The phone records showed that, in addition to other calls before and after, Vargas received a call at 10:30 p.m. from a throwaway phone later identified as belonging to Miles. At 10:31 p.m., Vargas phoned Lee at the casino, and at 10:32 p.m., Vargas called Miles back. After that, Lee drove the car back into the United States, and Miles took the tunnel bus.

Vargas and Lee were convicted on all counts. Lee was sentenced to 100 months' imprisonment, and Vargas was sentenced to the mandatory minimum of 240 months' imprisonment. This appeal followed.

## II.

### A.     Sufficiency of the Evidence

We review *de novo* the denial of a motion for acquittal challenging the sufficiency of the evidence. *United States v. Mabry*, 518 F.3d 442, 447-48 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1523 (2009). The relevant question on direct appeal is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making this determination, "we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994).[1]

Vargas argues that the only evidence against him, apart from the testimony of his codefendant, was that he was arrested after looking inside the rental car in which the pills were found. For support, Vargas relies on *United States v. Craig*, 522 F.2d 29 (6th Cir. 1975), in which we reversed a conviction for aiding and abetting the possession of drugs when the only evidence was that the defendant drove his codefendant and a closed box containing drugs to the apartment where the controlled purchase occurred. We held that the

---

[1]Although the government initially argued that our review was for a "manifest miscarriage of justice," the government acknowledged at oral argument that defense counsel for Vargas had made a proper motion for judgment of acquittal at the close of all the proofs.

evidence of defendant's presence outside the apartment and his successful flight from the police was not sufficient to support his conviction.

Here, although it is true that Lee concealed Vargas's involvement from the agents on the night of their arrest, the jury could have believed that she was trying to protect him. There was corroborating evidence of his involvement reflected in the money gram receipt and cell phone records. In addition, Lee testified that Vargas was directing their activities, specified the make and model of the rental car, financed the trip, met with Miles twice, called Lee at the casino, and showed up at the CVS once the controlled delivery was arranged. Taking the evidence in the light most favorable to the government, there was sufficient evidence to lead a rational trier of fact to conclude that Vargas joined in the conspiracy to import and possess with intent to distribute drugs, aided and abetted Lee in the importation and possession of the drugs, and attempted to possess the drugs himself outside the CVS. To the extent that Vargas is arguing that Lee should not be believed, this court does not assess the credibility of witnesses in reviewing the denial of a motion for judgment of acquittal. *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005).

Vargas also asserts in passing that the jury's finding that the substance involved methamphetamine was against the "great weight of the evidence." However, the record does not reflect that the defendant made a motion for new trial under Fed. R. Crim. P. 33 on this or any other ground. *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988) (explaining review on appeal of denial of such motion is for clear and manifest abuse of discretion). Assuming that Vargas means to challenge the sufficiency of the evidence that

the substance involved methamphetamine, the only evidence offered concerning the actual

composition of the pills came through the stipulation concerning the testimony of the forensic

chemist who analyzed the pills. In fact, it was stipulated that one bag of pills contained

tablets consisting of both methamphetamine and MDMA, and that the other two bags of pills

contained tablets that consisted of methamphetamine with only traces of MDMA. This

evidence was uncontested and was more than sufficient to establish that the controlled

substance involved more than 500 grams of a mixture containing a detectable amount of

methamphetamine.

**B.      Sentencing**

This court reviews challenges to the reasonableness of a defendant's sentence for

abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). While there is both a

procedural and a substantive component to the reasonableness inquiry, defendant's claims

of error seem to be framed in terms of procedural unreasonableness. *Id*.

Based upon a quantity of at least 1,500 grams but not more than 5,000 grams of a

mixture containing methamphetamine, the district court determined that defendant had a base

offense level of 34. *See* USSG § 2D1.1(c)(3). The district court added two levels because

the offense involved the unlawful importation of methamphetamine, USSG § 2D1.1(b)(4),

and two levels for Vargas's role as a leader or organizer, USSG § 3B1.1(c). With a total

offense level of 38 and a prior criminal history category of III, the applicable guidelines

range was 292 to 365 months' imprisonment. The government filed notice of its intention

to seek a mandatory minimum 20-year sentence on counts 1 and 3 pursuant to 21 U.S.C. §

960(b)(1), and on counts 2, 4, and 5 pursuant to 21 U.S.C. § 841(b)(1)(A). Defendant objected to the application of the mandatory minimum sentences, as well as to the adjustments to his offense level. The district court overruled the objections and found the applicable sentencing guidelines range was 292 to 365 months. However, the district court granted a downward variance from that range and sentenced defendant to concurrent mandatory minimum terms of 240 months' imprisonment on each count.

### 1.    Mandatory Minimum

The penalty provisions found in § 841(b)(1)(A)(viii) and § 960(b)(1)(H) provide for sentences of not less than ten years' imprisonment—and not less than 20 years' imprisonment if the offense is committed after a prior felony drug offense becomes final—in the case of a violation *involving* "500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers." Vargas argues here, as he did in the district court, that the mandatory minimum sentences should not apply because there was no evidence that he *knew* the pills contained methamphetamine. The government does not dispute that, if the drugs had not contained methamphetamine, but had contained only MDMA, and taking into account the defendant's prior felony drug conviction, the defendant would have faced a *maximum* sentence of 30 years and no mandatory minimum sentence under § 841(b)(1)(C) and § 960(b)(3).

Emphasizing that he did not stipulate that he *knew* that the pills contained methamphetamine, Vargas argues that the pills were shaped and marked like ecstasy, the estimated value was calculated as if the pills were to be sold as ecstasy, and Lee's written

statement referred to the pills as ecstasy. Defendant argues that it is unjust to punish him more harshly when it appears that everyone seemed to believe the pills contained ecstasy. On the contrary, while *Apprendi* taught that the statutory maximum may not be increased without a jury determination as to the type and quantity of drugs "involved," we have held that, even after *Apprendi*, the government need not prove a defendant's *mens rea* as to the type or quantity of drugs involved to establish a violation of § 841(a). *United States v. Garcia*, 252 F.3d 838, 844 (6th Cir. 2001) (discussing *Apprendi v. New Jersey*, 530 U.S. 466 (2000)). Likewise, intent is irrelevant to the penalty provisions of § 841(b), which require only that specified types or quantities of drugs be "involved" in the offense. *Id*.; *see also United States v. Gunter*, 551 F.3d 472, 484-85 (6th Cir.), *cert. denied*, 130 S. Ct. 194 (2009); *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003) (reaffirming *Garcia* and noting that "[a]t least six of our sister circuits have agreed that *Apprendi* does not require proof of knowledge or intent with respect to drug type and quantity") (citing cases).

Without addressing these controlling cases, defendant argues that a *mens rea* element should be read into the penalty provisions of these statutes and relies on the Supreme Court's decision to impute a *mens rea* requirement into the child-pornography statute at issue in *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994). This exact argument was squarely rejected by the Second Circuit, which concisely explained that:

> Under some circumstances courts will depart from the plain language of the statute and will impute a *mens rea* requirement into a criminal statute (or apply the *mens rea* from one portion of a criminal statute to another). *See, e.g.*, *X-Citement Video*, 513 U.S. at 71; *Staples* [*v. United States*], 511 U.S. [600, 619 (1994)]. However, none of those circumstances exist in this case. First, this is not a situation where a traditional common law offense has been

codified without inclusion of a *mens rea* element, warranting imputation of a *mens rea* element from the common law. *See, e.g., Morissette v. United States*, 342 U.S. 246, 262 [] (1952). Second, because § 841(a) contains a *mens rea* element, there is no risk that, absent a requirement that the defendant knew the quantity and type of narcotics involved in the offense, his apparently innocent conduct will be criminalized. *See X-Citement Video*, 513 U.S. at 71 []; *Liparota v. United States*, 471 U.S. 419, 426 (1985). For the same reason, there is no risk that a defendant convicted under § 841 will incur a relatively severe penalty provided in the statute absent a sufficiently culpable mental state. *See X-Citement Video*, 513 U.S. at 72 []. Accordingly, we find no basis for disturbing the settled principle that drug dealers convicted under § 841(a) need not know the type and quantity of drugs in their possession in order to be subject to sentencing enhancements contained in § 841(b). In so holding, we join all of the courts of appeals that have considered this issue after the Court announced its decision in *Apprendi*.

*United States v. King*, 345 F.3d 149, 153 (2d Cir. 2003). Likewise, there is no showing in this case that any of the circumstances exist that would cause the courts to depart from the plain language and impute a *mens rea* requirement into sentencing enhancements based on the type or quantity of drugs provided for under 21 U.S.C. § 841(b) and § 960(b)(1).

## 2.     Leadership Enhancement

A district court's determination as to the defendant's role in the offense is a finding of fact to be reviewed for clear error. *United States v. Brown*, 946 F.2d 1191, 1196 (6th Cir. 1991). To qualify for a two-level increase in the offense level under USSG § 3B1.1(c), the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. Vargas argues that this enhancement was based entirely on codefendant Lee's testimony at trial, which he characterizes as "incredible at best and at worst outright perjury." It is clear that the jury rejected Lee's claim of innocence, and concluded that she and Vargas were both involved in the conspiracies. Given the evidence that Vargas was directing their

activities, it was not clearly erroneous for the district court to find that the enhancement should be imposed.

Moreover, even if we were to conclude otherwise, any error in this regard would have been harmless. Without the two-level enhancement at issue, Vargas would have had a total offense level of 36 and a criminal history category of III, which corresponds to a sentencing guidelines range of 235 to 293 months. Given the mandatory minimum sentences, the effective guidelines range was 240 to 293 months. Since Vargas was sentenced to the mandatory minimum, he could not have received a lower sentence even without this enhancement.

**AFFIRMED.**