# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 04-3587
No. 04-4149

_____

United States of America,

    Appellant/Cross-Appellee,

v.

Anna Cacioppo,

    Appellee/Cross-Appellant.

Appeal from the United States
District Court for the
Western District of Missouri.

_____

No. 04-3588
No. 04-3713

_____

United States of America,

    Appellant/Cross-Appellee,

v.

Richard Dean Plaskett, Jr., also
known as Don Plaskett,

    Appellee/Cross-Appellant.

_____

Submitted: April 20, 2006
Filed: August 22, 2006
_____

Before MURPHY, MELLOY and GRUENDER, Circuit Judges.
_____

GRUENDER, Circuit Judge.

A jury convicted Anna Cacioppo and Richard Dean Plaskett of five counts of making false statements and/or failing to disclose certain facts in documents required to be kept by the Employee Retirement Income Security Act of 1974 ("ERISA") in violation of 18 U.S.C. §§ 1027 and 2. According to the jury verdicts, Cacioppo made the false statements and/or failed to disclose facts required to be disclosed in documents she submitted to Local 264 of the Laborers International Union of North America ("Local 264") and the Laborers Welfare Fund and Laborers Pension Fund (collectively, the "264 Fund"). While Plaskett did not directly submit paperwork to the 264 Fund, the indictment alleged that he was punishable as a principal pursuant to § 2. The jury also convicted Cacioppo of six additional counts of violating § 1027 with respect to documents she submitted to Local 1290 of the Laborers International Union of North America ("Local 1290") and the Kansas Welfare Fund and the Kansas Pension Fund (collectively, the "1290 Fund").

Following trial, the district court entered a judgment of acquittal in favor of Cacioppo and Plaskett as to the counts of conviction based upon their submissions to the 264 Fund. The district court did not rule on Plaskett's alternative motion for a new trial. The district court refused to set aside the jury verdicts against Cacioppo for the counts of conviction related to the 1290 Fund submissions. The United States appeals the judgment of acquittal for Cacioppo and Plaskett. Plaskett cross-appeals

the district court's failure to decide his motion for a new trial, and Cacioppo cross-appeals the denial of her motion for a new trial with respect to her submissions to the 1290 Fund. We affirm in part and reverse in part.

## I.   BACKGROUND

A Special Grand Jury returned a 39-count indictment charging five individuals with conspiracy, bribery and mail fraud, as well as the ERISA reporting violations that are the subject of this appeal. The conspiracy, bribery and mail fraud counts related to demolition and asbestos-removal work to be done for Rockhurst University in Kansas City, Missouri. Plaskett was the co-owner of Industrial Environmental Management ("IEM"), an asbestos removal company in Kansas City, Missouri, that employed both union and non-union employees at its work sites. Plaskett's partner in IEM was Charles A. Cacioppo, Jr. Charles Cacioppo's daughter, Anna Cacioppo, worked as an office employee at IEM during the relevant period. The ERISA reporting counts centered upon two collective bargaining agreements that IEM entered, one with Local 264 and another with Local 1290, and the employee benefit payments for which IEM was responsible.

In February 1999, IEM entered into a collective bargaining agreement with Local 264 for "covered work" in certain counties in Missouri and Kansas (the "IEM-264 Association Agreement"). Plaskett signed on IEM's behalf. The agreement provided, among other things, that the parties would provide a fringe benefit program and that IEM would pay into the fringe benefit fund a specific amount for each hour of "covered work" conducted by "each employee covered by" the agreement. To implement the fringe benefit program, Article VIII of the IEM-264 Association Agreement required IEM to "file a written report . . . setting forth the names, social security numbers and the hours paid for each employee for whom [benefit] payments shall have been made during said period and such other information as the fringe

benefit program trustees desire." The report, referred to as a "monthly remittance report," was to be submitted monthly along with IEM's payments to the 264 Fund. The monthly remittance report was required to be signed by an authorized employee at IEM, and Anna Cacioppo signed on IEM's behalf. Cacioppo certified, among other things, that "the employees listed [on the reports] constitute all employees for whom contributions are required under the terms of said agreements."

In April 2002, IEM entered a second collective bargaining agreement, this time with Local 1290 (the "Local 1290 Agreement"). Under the Local 1290 Agreement, IEM was required to pay benefits and to submit a similar monthly remittance report each month. In contrast to the IEM-264 Association Agreement which required the individual submitting reports to list "all employees *for whom contributions are required*," the reports to the 1290 Fund explicitly required IEM to "report on all employees, *union or non-union*." (Emphases added.) Again, Cacioppo prepared and submitted the reports on IEM's behalf.

Following seven days of trial, the jury acquitted Plaskett of conspiracy and bribery charges. It also acquitted Cacioppo of a mail fraud charge. However, the jury returned guilty verdicts against Plaskett and Cacioppo on Counts 28 through 32 of the indictment, which alleged that they violated § 1027 in connection with their submission of monthly remittance reports to the 264 Fund. The jury also convicted Cacioppo on Counts 33 through 38 of the indictment, which alleged that she violated § 1027 in connection with her submission of monthly remittance reports to the 1290 Fund.

After trial, the district court set aside the 264 Fund-related jury verdicts and entered judgments of acquittal in favor of Plaskett and Cacioppo with respect to those charges. The district court found insufficient evidence that the IEM-264 Association Agreement actually required IEM to list all employees, including non-union

-4-

employees.  The district court did not rule on Plaskett's alternative motion for a new trial.  The district court denied Cacioppo's request for a judgment of acquittal or, in the alternative, a new trial on the charges that she violated § 1027 in connection with her reporting to the 1290 Fund.  The district court sentenced Cacioppo to 5 years' probation for those convictions.

## II.    DISCUSSION

The Government argues that the district court erroneously granted Cacioppo and Plaskett's motions for judgment of acquittal on Counts 28 through 32 of the indictment because the evidence was sufficient to sustain the jury's verdicts.  Plaskett cross-appeals the district court's failure to rule on his motion for a new trial as to those counts.  Cacioppo appeals her convictions on Counts 33 through 38 of the indictment.  She argues that the district court improperly instructed the jury that it could convict Cacioppo based upon her reckless disregard for, rather than knowledge of, the falsity of her statements or the completeness of her submissions.  Cacioppo also asserts that the jury should have been given a "good faith" instruction.

We begin by determining the proper mens rea requirement for a conviction under § 1027—an issue raised by Cacioppo's cross-appeal, but which also affects our analysis of the disposition of the Government's appeal.  We then address the various motions for judgment of acquittal and new trial to determine whether the evidence was sufficient for a reasonable jury to find guilt beyond a reasonable doubt under the correct mens rea standard and, if so, whether a new trial is warranted due to misinstruction of the jury.  We view this as the appropriate method of deciding the appeal and two cross-appeals that the parties present.  *See United States v. Boyd*, 566 F.2d 929, 937-38 (5th Cir. 1978) (reasoning that the district court misconceived the elements of the offense and, therefore, reviewing the evidence under the correct standard to resolve an appeal concerning the sufficiency of the evidence).

## A. Section 1027's Mens Rea Requirement

Section 1027 criminalizes two separate activities.[1]  First, § 1027 provides for criminal penalties when any person makes in any document required to be kept for ERISA purposes "any false statement or representation of fact, knowing it to be false" (the "false statement prong").  Second, § 1027 provides for criminal penalties when any person "knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by [title I of ERISA] or is necessary to verify, explain, clarify or check for accuracy and completeness of any report required by such title to be published or any information required by such title to be certified" (the "concealment prong").

With respect to § 1027's false statement prong, the district court instructed the jury that Cacioppo and Plaskett could be found guilty if either "acted knowingly and in the case of a false statement, with knowledge that the statement was false *or with reckless disregard for its truth or falsity*."  Jury Instruction No. 34 (emphasis added).  The district court further instructed the jury that "the government must [prove] that the defendant had knowledge that the statement was false *or acted with reckless*

---

[1]Section 1027 states:

> Whoever, in any document required by title I of the Employee Retirement Income Security Act of 1974 . . . to be . . . kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

*disregard for whether or not it was false.*" Jury Instruction No. 38 (emphasis added). With respect to § 1027's concealment prong, the district court instructed the jury that Cacioppo and Plaskett could be found guilty if either "acted knowingly . . . and in the case of a concealment, cover up, or failure to disclose, without a ground for believing his action was lawful *or with reckless disregard for its lawfulness.*" Jury Instruction No. 34 (emphasis added). Concerning both prongs, the district court added that, "[r]egardless of whether the charge involves a false statement or a concealment, cover up, or failure to disclose a fact, however, the government need not prove that the defendant intended to violate the law *or that he had actual knowledge of his obligations under the law.*" Jury Instruction No. 38 (emphasis added). In so doing, the district court rejected Cacioppo and Plaskett's proffered instructions, which omitted any reference to reckless disregard.

Cacioppo contends that the district court should not have allowed the jury to find guilt based solely upon a reckless disregard of the falsity of her statements or a reckless disregard for the completeness of her reporting. The Government counters that § 1027 has long been interpreted in a way that allows convictions based upon reckless disregard. In this regard, the Government relies primarily upon *United States v. Tolkow*, 532 F.2d 853, 858 (2d Cir. 1976) and *United States v. S & Vee Cartage, Co.*, 704 F.2d 914, 918-19 & n.1 (6th Cir. 1983), both of which approved § 1027 instructions that included a reckless disregard mens rea standard. We conclude that the district court erred when it instructed the jury that reckless disregard of the falsity of statements or completeness of reporting was a sufficient basis upon which to convict.

We begin with the fairly obvious observation that "reckless disregard" appears nowhere in § 1027, as authored by Congress. We also note that the Supreme Court has repeatedly declined opportunities to imply a mens rea requirement somewhere between knowingly and strict liability in cases similar to the one we consider here.

-7-

*See, e.g., United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994); *Liparota v. United States*, 471 U.S. 419 (1985). Nevertheless, we examine both of § 1027's prongs to determine what mens rea standard is appropriate.

The least complicated issue to resolve is the proper mens rea under the false statement prong, as the district court's insertion of a reckless disregard mens rea standard into § 1027's false statement prong conflicts with the statute's plain language. It is well established that we commence any statutory interpretation with the statute's plain language. *See, e.g., Watson v. Ray*, 192 F.3d 1153, 1155 (8th Cir. 1999) ("When determining the meaning of a statute, our starting point must be the plain language of the statute."). Where the language is plain, we need inquire no further. *See, e.g., United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("Where . . . the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (internal quotation omitted).

Here, it is impossible to square the district court's instruction that the jury could find Cacioppo guilty of making a false statement if Cacioppo "acted with reckless disregard for whether or not it was false" with the statute's provision that a defendant can be found guilty only for making a false statement "knowing it to be false." § 1027. A person is said to have knowledge of a fact when she "has no substantial doubt about [its] existence." Black's Law Dictionary 888 (8th ed. 2004); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) ("'Knowledge' and 'knowingly' are normally associated with awareness, understanding, or consciousness."). "Recklessness," on the other hand, reflects something less than knowledge of a statement's falsity. *See, e.g.*, 37 Am. Jur. 2d *Fraud & Deceit* § 120 (2006) ("A representation is 'reckless' if it is made without any knowledge of the truth, or if the person making the representation knows that he or she does not have sufficient information or a basis to support it, or if the maker realizes that he or she does not know whether or not the statement is true."). We have noted this distinction

repeatedly in the context of the False Claims Act, 31 U.S.C. § 3729(a). *See, e.g.*, *Minn. Ass'n of Nurse Anaesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002) (addressing the False Claims Act's mens rea requirement and distinguishing between whether defendants "knew" or "would have known absent . . . reckless disregard" that bills submitted to Government would falsely imply that certain services had been rendered). Indeed, it is clear from our False Claims Act jurisprudence that Congress's insertion of a reckless disregard standard captures defendants who lacked actual knowledge. *See id.* Where, in the context of representations to ERISA plans, Congress instead has elected to make persons criminally liable only for those false statements made "knowing [them] to be false," we are bound to enforce the law as written.

The concealment prong presents a more difficult issue, as the prong's language is susceptible to two readings. The question we must decide is whether "knowingly" modifies only the clause addressing a defendant's acts (that is,"knowingly conceals, covers up, or fails to disclose") or whether "knowingly" also modifies the concealment prong's second clause ("the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified"). In other words, we must decide whether § 1027 allows criminal conviction *only* where someone "conceals, covers up, or fails to disclose" facts that she knew she was required to disclose *or* whether § 1027 criminalizes the knowing concealment, cover up or failure to disclose certain facts, regardless of whether the defendant knew she was required to reveal, uncover or disclose them.

We hold that the former reading is correct. In our view, *Tolkow* and *S & Vee Cartage*—both of which allowed instructions that included a reckless disregard mens rea standard—are in conflict with the reasoning of subsequent decisions of the Supreme Court. For instance, in *Liparota*, the Supreme Court addressed the mens rea

requirement of 7 U.S.C. § 2024(b)(1), which provided that "whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or the regulations" is subject to criminal penalties. 471 U.S. at 420. The question to be resolved was whether "knowingly" modified only the use, transfer, acquisition, alteration or possession portion of the statute or if it also modified the phrase "in any manner not authorized." *Id.* at 420-21. That is, just as in this case, "[t]he question presented [was] whether . . . the Government must prove that the defendant knew that he was acting in a manner not authorized by statute or regulations." *Id.*

In *Liparota*, the Supreme Court applied a two-step method of statutory interpretation, first looking to the statute's plain language and structure and, in the absence of clear language, then attempting to infer the statute's meaning from its legislative history. *Id.* at 423. Beginning with § 2024(b)(1)'s plain language, the Supreme Court found that, while it was clear that Congress intended to require a mens rea of "knowingly" with respect to some act, it was unclear whether "knowingly" applied merely to possession of the coupons and cards or whether the statute required both knowing possession and knowledge that the possession was proscribed by law. *Id.* at 424. The Court concluded that "[e]ither interpretation would accord with ordinary usage." *Id.* Because the statute's plain language was ambiguous, the Court then examined the statute's legislative history. *Id.* It found, however, that "the legislative history of the statute contains nothing that would clarify the congressional purpose on this point." *Id.*

The *Liparota* Court then held that, absent a clear indication to the contrary—from either the statute's plain language or legislative history—the Court would presume that Congress intended to apply "knowingly" to both elements of the statute because "to interpret the statute otherwise would . . . criminalize a broad range of apparently innocent conduct." *Id.* at 425-26. Specifically, it stated that, "[a]bsent

indication of contrary purpose in the language or legislative history of the statute, we believe that § 2024(b)(1) requires a showing that the defendant knew his conduct to be unauthorized by statute or regulations." *Id.* at 425.

Since *Liparota*, the Court has consistently applied this presumption to statutes where construing the statute more broadly would criminalize otherwise innocent conduct. *See Arthur Andersen LLP*, 544 U.S. at 703-74 (noting that reading a statute to require corrupt intent "is particularly appropriate . . . where the act underlying the conviction . . . is by itself innocuous"); *Staples v. United* States, 511 U.S. 600, 610 (1994) (addressing "the particular care we have taken to avoid construing a statute to dispense with mens rea where doing so would criminalize a broad range of apparently innocent conduct") (internal quotation omitted); *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 524 (1994) (requiring in a drug paraphernalia case "the Government [to] establish that the defendant knew that the items at issue are likely to be used with illegal drugs"); *Ratzlaf v. United States*, 510 U.S. 135, 149 (1994) (holding in a currency transaction structuring case that "[t]o convict Ratzlaf of the crime with which he was charged . . . , the jury had to find he knew the structuring in which he engaged was unlawful"), *superseded by statute*, 31 U.S.C. §§ 5322(a), (b), 5324(c). Indeed, the Court has extended the application of "knowingly" to elements in separate subsections of a criminal statute—that is, to phrases more remote than we do here. *See X-Citement Video*, 513 U.S. at 68, 72 (reasoning that "*Morisette*, reinforced by *Staples*, instructs that the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct" and applying "knowingly" to the elements in each subsection of the statute, even where the word did not appear in each subsection).

We have followed suit in cases where a broad range of apparently innocent conduct would be criminalized by a particular reading of an ambiguous statute's mens rea requirement. *See United States v. Jain*, 93 F.3d 436, 440 (8th Cir. 1996) ("Only

conduct that is inevitably nefarious, that is, obviously 'evil' or inherently 'bad,' warrants the traditional presumption that anyone consciously engaging in it has fair warning of a criminal violation. Thus, we agree with the district court's decision to instruct the jury that the government must meet a heightened *mens rea* burden.") (internal citation and quotation omitted); *cf. United States v. Collins*, 949 F.2d 1029, 1031 (8th Cir. 1991) (refusing to expand the reach of "knowingly" within a statute where the defendant had reason to know that the use of explosives "is a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety") (quoting *Liparota*, 471 U.S. at 433).

Applying *Liparota*'s reasoning to this case, we conclude that the Government is required to prove both that the defendant knowingly "conceal[ed], cover[ed] up, or fail[ed] to disclose a[] fact" that she was required to disclose *and* that she knew that she was obliged to disclose it. We begin with the statute's plain language and structure. A comparison of the statute at issue in *Liparota* and the statute here shows them to have identical structures in all relevant respects.[2] The plain language of both statutes is equally ambiguous as to whether "knowingly" applies to a defendant's knowledge of the requirements of the relevant regulations or statute.

Here, however, unlike in *Liparota*, the statute's structure offers one additional clue as to congressional intent. Congress specifically provided in § 1027 that one may

---

[2]*Compare* § 1027, providing that "whoever . . . knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by [title I of ERISA] or is necessary to verify, explain, clarify or check for accuracy and completeness of any report required by such title to be published or any information required by such title to be certified" is subject to prosecution *with* § 2024(b)(1), providing that "whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or regulations" is subject to prosecution.

-12-

be convicted under the false statement prong of the statute only if the statement is made "knowing it to be false." On the other hand, under the Government's reading of § 1027's concealment prong, a defendant could be convicted for concealing facts, even though she was unaware that she was required by law to disclose them. Nothing in the statute's language, structure or history indicates to us that Congress meant to apply different mens rea standards to two different means of violating § 1027. That is, we see nothing indicating that Congress meant to allow conviction for affirmative statements only when the defendant knows they are false but, at the same time, to allow conviction for the failure to disclose facts where the defendant was unaware of the duty to disclose them. To the contrary, in our view, the provision that false statements are punishable only if made "knowing [them] to be false" indicates that Congress meant to restrict the type of activity that § 1027 criminalized rather than to write the statute as expansively as possible.

Applying the second step of *Liparota*'s analysis, the legislative history here does not indicate clearly that Congress intended to circumscribe the reach of "knowingly" in a way that criminalized the failure to disclose certain information where the defendant was unaware of a duty to disclose it. We acknowledge that *Tolkow* addressed § 1027's legislative history and found that the history indicated that Congress intended § 1027 to be applied broadly, 532 F.2d at 858, but we are unpersuaded that the legislative history requires us to read into the statute a reckless disregard standard that appears nowhere in its text. *Tolkow* takes an extraordinarily broad view of § 1027's legislative history, noting only that § 1027 was passed with the intent to give the Welfare and Pension Plans Disclosure Act[3] "enforcement teeth." *Id.* at 858. But observing that a particular statute is meant to have teeth is not the same as defining the extent of its bite. Congress undoubtedly intended the anti-child pornography statute addressed in *X-Citement Video* to have "teeth," as it had recently

---

[3]Section 1027 was amended in 1974 to refer to ERISA rather than the WPPDA. Pub. L. 93-406.

broadened the statute's application to regulate even more pornographic material than did previous iterations of the statute. 513 U.S. at 74 (discussing the expansion of the statute in 1984 to regulate materials that were not legally "obscene," whereas an earlier version of the bill had limited itself to actual obscenity). The Supreme Court, however, still read the statute in a way that required a defendant to know that he was transporting a video that depicted an actual minor. *Id.* at 78.

More to the point, in lieu of *Tolkow*'s exceedingly broad view of the legislative history, *Liparota* and its progeny require us to examine the legislative history with an eye toward determining whether Congress made some statement particularly addressing the intended mens rea requirement. *See, e.g., X-Citement Video* at 74-75 (examining legislative history regarding the intended mens rea requirement). After our review of § 1027's legislative history, we see nothing addressing the mens rea requirement at all, much less indicating that Congress intended to criminalize the failure to report certain information even where the actor was unaware of the duty to do so. *See* H. R. Rep. No. 87-998, pt.4 (1962), reprinted in 1962 U.S.C.C.A.N. 1532-1537-39, 1547. When interpreted in this fashion, the statute still has "enforcement teeth," but captures only those actors who deliberately conceal, cover up or fail to disclose information that they knew they were required to reveal, uncover or disclose.

For all these reasons, we conclude that neither the statute's plain language nor the statute's legislative history clearly indicate that Congress intended to criminalize conduct where the defendant was unaware of a duty to disclose the information allegedly concealed. We further find that the Government's reading of the statute would criminalize an extraordinary amount of otherwise innocent conduct. For instance, if a clerical employee failed to retain any document that the benefit fund later decided it needed "to verify, explain, clarify or check for accuracy and completeness any report required" by ERISA, she could later be held criminally liable, even though she had no reason to suspect that she was required to create or keep the document—or,

-14-

indeed, even if she had no idea of the document's purpose. Because the Government's reading of the statute would criminalize apparently innocent conduct, we apply *Liparota*'s presumption and conclude that Congress intended to apply "knowingly" to both clauses of § 1027's concealment prong.[4]

We pause to address two final, but important issues. First, our holding does not imply that a defendant must in fact know that § 1027 exists and that she is violating it before she can be held to account in a criminal prosecution. We hold only that the defendant must have known that she was required to disclose the information she allegedly concealed. The Supreme Court discussed this distinction in *Liparota*. 471 U.S. at 426 n.9.[5] Second, our decision concerning the proper mens rea requirement

_____

[4]Following *Liparota*, we have not labeled the crime in question in this case as either a "specific" or "general" intent crime. These two categories fail to describe adequately the possible mens rea requirements. *See Liparota*, 471 U.S. at 423 n.5 ("We have also recognized that the mental element in criminal law encompasses more than the two possibilities of 'specific' and 'general' intent.").

[5] Differentiating between *Liparota*'s interpretation of § 2024(b)(1)'s mens rea requirement and a mistake-of-law defense, the *Liparota* Court wrote:

Our holding today no more creates a "mistake of law" defense than does a statute making knowing receipt of stolen goods unlawful . . . . In both cases, there is a legal element in the definition of the offense. In the case of a receipt-of-stolen-goods statute, the legal element is that the goods were stolen; in this case, the legal element is that the "use, transfer, acquisition," etc. were in a manner not authorized by statute or regulations. It is not a defense to a charge of receipt of stolen goods that one did not know that such receipt was illegal, and it is not a defense to a charge of a § 2024(b)(1) violation that one did not know that possessing food stamps in a manner unauthorized by statute or regulations was illegal. It *is,* however, a defense to a charge of knowing receipt of stolen goods that one did not know that the goods were stolen, just as it is a defense to a charge of a § 2024(b)(1) violation that one did

-15-

in no way affects how the Government can go about proving that the required mens rea exists. Despite the requirement that the Government prove that a particular defendant knowingly concealed information she knew she was required to disclose, "knowledge can [still] be inferred from circumstantial evidence, including any external indications" that she knew that she was required to keep or disclose the particular information. *Staples*, 511 U.S. at 615 n.11; *see also Ratzlaf*, 510 U.S. at 149 n.19 ("A jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct . . . .").

## B. Motions for Judgment of Acquittal and New Trial

Having decided the proper mens rea requirement under § 1027, we must decide whether the district court appropriately decided the various post-trial motions. We review de novo the grant of a post-trial motion for judgment of acquittal, *United States v. Hively*, 437 F.3d 752, 760 (8th Cir. 2006), using the same standards used by the district court, *United States v. Monnier*, 412 F.3d 859, 861 (8th Cir. 2005). Fed. R. Crim. P. 29(a) provides that the district court "must enter judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "When considering whether there is sufficient evidence to support a conviction, we view the evidence in the light most favorable to the verdict, giving it the benefit of all reasonable inferences." *Monnier*, 412 F.3d at 861 (quotation omitted). A motion for judgment of acquittal should be granted only "if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999).

---

not know that one's possession was unauthorized.

471 U.S. at 425 n.9.

### 1. Counts 28 Through 32: Monthly Remittance Reports Submitted to the 264 Fund

The district court granted Cacioppo and Plaskett's motions for judgment of acquittal on Counts 28 through 32 of the indictment, reasoning that there was insufficient proof that the IEM-Local 264 Association Agreement actually required Cacioppo and Plaskett to report the names of all workers at any work site, irrespective of whether they were union members. We affirm the judgment of acquittal in favor of Cacioppo, albeit for a different reason. *See United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999) ("We may affirm the judgment on any grounds supported by the record, even if not relied on by the district court."). However, we reverse the judgment of acquittal in favor of Plaskett and remand for the district court to determine if he is entitled to a new trial.

### a. Motions for Judgment of Acquittal

Given our resolution of the mens rea issue above, the question we must resolve with respect to the reporting to the 264 Fund is whether the Government presented evidence sufficient to allow a reasonable jury to find Cacioppo and Plaskett guilty beyond a reasonable doubt of knowingly making false statements and/or knowingly concealing or failing to disclose facts they knew they were required to disclose.

We briefly restate the evidence in the light most favorable to the verdict, resolving evidentiary disputes in favor of the Government. We begin with the IEM-264 Association Agreement. Article III of the agreement provided that the parties "recognize[d] the Union as the exclusive bargaining agent *for all employees of the Employer* performing any type of construction work which has historically and traditionally been performed heretofore by Laborers in the geographical area of this

-17-

Agreement." (Emphasis added.) Article IV of the agreement recognized the Union "as the sole and exclusive bargaining agent *for all employees coming within the terms of this Agreement*." (Emphasis added.) Article VIII provided that "[t]he parties agreed to provide a fringe benefit program . . . which program is to be maintained by contributions from employers under the terms of this Agreement and is established for the benefit of employees of members of the Association" and that "[o]n all work covered . . . each employer shall pay to the Fringe Benefit Program the amounts per hour set forth in [the agreement] for each hour paid . . . *to each employee covered by this Agreement*." (Emphasis added.) Finally, Article VIII required IEM to "file a written report . . . setting forth the names, social security numbers and the hours paid for each employee for whom payments shall have been made during said period and such other information as the fringe benefit program trustees desire."

Suzanne Clark Bradley, who managed IEM's offices until March of 2002, was responsible during an undefined period in 1999 for preparing and submitting the monthly remittance reports. Bradley testified that she understood that she was required to list all employees on the monthly remittance reports, irrespective of union membership. Her understanding was based solely upon her reading of the IEM-264 Association Agreement. Bradley further testified that she prepared the monthly remittance reports by running a pre-defined "Time-by-Name Report" on IEM's financial software. Bradley testified that Plaskett told her to remove names from the reports she had prepared. Bradley also testified that she had a conversation with Plaskett and his partner, Chuck Cacioppo, Jr., about the reporting:

> Q. When you were doing these reports then for . . . Plaskett, did you discuss how to fill out the forms, who was supposed to be on the forms, that kind of information?
>
> A. Yes, I did.
>
> Q. Tell us about that, please.

A. I was basically told after I did a couple of them to mind my own business.

Q. Tell us about that conversation, who was there, what was the conversation?

A. I had had a conversation with Don in regard to union and non union employees and who we were paying on and who we weren't paying on and I was basically told just to keep my nose out of it.

Q. By who?

A. By . . . Plaskett and Chuck [Cacioppo, Jr.].

Trial Tr. Vol. II at 411:18-412:7.

Anna Cacioppo took over the reporting duties when she began working at IEM. Bradley did not testify that she informed Cacioppo that Cacioppo should list all employees, irrespective of union membership. When asked whether she explained the reporting requirements to Cacioppo, Bradley said only that she "basically showed [Cacioppo] how [Bradley] did [the reports] in the beginning and gave [Cacioppo] the time by name report and she was to discuss it with [Plaskett] and how he wanted to pay." *Id.* at 413:25-414:2. Bradley later testified that she "showed Anna how the reports were to be pulled out of the computer and how [Plaskett] showed [Bradley] to do them. And basically Anna dealt with [Plaskett] from that point forward." *Id.* at 436:4-6.

The Government also called Leslie Williams, who had been president and business manager for Local 264 for 22 years and a trustee for the Laborers Fringe Benefit Office Health and Welfare Fund. Williams testified that the IEM-264 Association Agreement required IEM to report and pay fringe benefits for every employee, irrespective of union membership, from the very first day of employment. Williams further testified that the union had field representatives who were

responsible for telling employers about their responsibilities with respect to paying fringe benefits. Williams also testified that Plaskett signed the collective bargaining agreement on behalf of IEM. As to Cacioppo, Williams testified that he had never met her and had no idea whether she had ever seen the collective bargaining agreement.

Plaskett testified that he did not list non-union employees "because the union agreement doesn't tell us to do that." Trial Tr. Vol. IV at 793:14-15. He further testified that, to meet what he perceived to be the reporting requirements, he set up on IEM's computer a recurring report that listed all employees working on a project. Plaskett called it the "Time-by-Name" report. Plaskett then applied to the Time-by-Name report a filter that eliminated the names of non-union employees. Plaskett testified that, as soon as an employee reported that he joined the union, Plaskett then changed the designation of that employee and IEM would begin reporting their work on monthly remittance reports.

Cacioppo testified that she never read any union agreement. She stated that she prepared the report that was "memorized" on the computer. *Id.* at 876:23. According to Cacioppo, the report was "called '264,' something like that." *Id.* at 876:24. Referring to Cacioppo's role in the reporting, Plaskett confirmed that Cacioppo simply ran the Time-by-Name Report with the filters that Plaskett defined to yield only union members' names.

To decide whether either defendant's conviction can be upheld, we must first determine whether a reasonable jury could find that IEM was required to disclose the names of each employee on the monthly remittance reports, irrespective of union membership. We disagree with the district court's conclusion that no reasonable jury could so find. IEM agreed that "[o]n all covered work herein each employer shall pay to the Fringe Benefit Program the amounts set forth . . . for each hour paid . . . *to each*

*employee covered by this Agreement.*" In the same agreement, IEM "recognize[d] the Union as the exclusive bargaining agent *for all employees of the Employer* performing any type of construction work which has historically and traditionally been performed heretofore by Laborers in the geographical area of this Agreement." Based upon these two provisions alone, a reasonable jury could conclude that the employer was required to pay benefits for every employee, irrespective of union membership. Under Article VIII of the agreement, IEM was required to report every worker for whom benefit payments should be made. Accordingly, a reasonable jury could conclude that every employee, union and non-union, should have been listed on the monthly remittance reports.

Cacioppo's convictions under § 1027, then, turn upon whether she knowingly represented that all names required to be disclosed on the monthly remittance reports had been disclosed, knowing that representation to be false, or whether she knowingly failed to disclose employees she knew she was required to report.

With respect to Local 264, Cacioppo was required to certify that "the employees listed [on the reports] constitute all employees for whom contributions are required under the terms of said agreements." Rather than explicitly request that she list every employee, the monthly remittance reports called for Cacioppo to make some judgment concerning which employees IEM was required to disclose. Although we have concluded that a reasonable jury could have determined that the IEM-264 Association Agreement required Cacioppo to list all employees, irrespective of union membership, no proof was presented to the jury that would even support the inference that Cacioppo *knew* she was required to list every employee and then falsely certified that she had done so. To the contrary, she testified that she had never read the agreement and no one testified that they told her about its requirements. As such, we conclude that there was insufficient evidence that Cacioppo knowingly made a false statement when she certified the completeness of her reporting. For the same reasons, we also

conclude that there was insufficient evidence that she knowingly concealed the names of individuals she knew she was required to disclose. Accordingly, we affirm the judgment of acquittal in favor of Cacioppo on Counts 28 through 32 of the indictment.

However, under the deferential standard for reviewing jury verdicts, Plaskett's conviction should have been upheld. Again, we disagree with the district court's finding that no reasonable jury could conclude that the IEM-264 Association Agreement required IEM to disclose the work of all employees, irrespective of union membership. Plaskett's conviction therefore turns upon whether there was sufficient evidence to allow a reasonable jury to conclude that he knew that IEM was required to disclose the identity of the non-union employees and that he nevertheless caused Cacioppo to fail to disclose the information.[6]

We hold that there was. First, Plaskett signed the IEM-264 Association Agreement on behalf of IEM. Second, Les Williams testified that it was the union's practice to tell employers that they are required to pay benefits for all employees, irrespective of union membership. Third, Bradley testified that she believed that the names should be listed, that she discussed the reports with Plaskett, including the distinction between union and non-union employees, and that Plaskett told her to "keep her nose out of it." Viewing this evidence and all reasonable inferences from it in a light most favorable to the verdict, we find that a reasonable jury could conclude beyond a reasonable doubt that Plaskett knew that IEM was required to list

---

[6]Plaskett was charged with violating 18 U.S.C. §§ 1027 and 2. Title 18 Section 2 of the United States Code, provides in subsection (b) that "[w]hoever willfully causes an act to be done which, if directly performed by him or another would be an offense against the United States, is punishable as a principal." Because this statute "makes it unnecessary that the intermediary who commits the forbidden act have a criminal intent," *United States v. Rucker*, 586 F.2d 899, 905 (2d Cir. 1978) (internal quotation omitted), Plaskett could be found guilty even though Cacioppo lacked the requisite mens rea.

the IEM's non-union employees on the monthly remittance reports. The evidence also plainly shows that Plaskett caused Cacioppo to create and submit the incomplete monthly remittance reports. Indeed, Plaskett's own testimony indicated that he caused Cacioppo to file the monthly remittance reports without listing the names of IEM's non-union employees by virtue of the filter he programmed on IEM's computers that eliminated those names from the Time-by-Name Report in IEM's financial software. Accordingly, we reverse the district court's judgment of acquittal in favor of Plaskett on counts 28 through 32 of the indictment.

### b.    Plaskett's Motion for a New Trial

In addition to seeking a judgment of acquittal, Plaskett also moved in the alternative for a new trial. Although the district court granted Plaskett's motion for a judgment of acquittal, it failed to rule upon his alternative motion. Plaskett cross-appeals the district court's failure to rule in the alternative. We agree with Plaskett that the district court erred when it failed to rule in the alternative on Plaskett's new trial motion. Rule 29(d)(1) of the Federal Rules of Criminal Procedure states that "[i]f the [district] court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Accordingly, we remand for the district court to rule in the first instance on Plaskett's motion for a new trial on Counts 28 through 32 of the indictment.

### 2.    Counts 33 Through 38: Monthly Remittance Reports Submitted to the 1290 Fund

Cacioppo also appeals the denial of her motion for a new trial on Counts 33

through 38 of the indictment, arguing that the jury was misinstructed.[7]  "Jury instructions are adequate if, taken as a whole, they adequately advise the jury of the essential elements of the offenses charged and the burden of proof required of the government."  *United States v. Rice*, 449 F.3d 887, 895 (8th Cir. 2006) (internal quotation and alteration omitted).  As we discussed in part II.A., *ante*, the jury was improperly instructed as to the appropriate mens rea requirement under § 1027.  Nevertheless, our inquiry does not end there, as "[p]roperly objected to jury instructions are reviewed for harmless error pursuant to Fed. R. Crim. P. 52(a)."  *United States v. Jacobs*, 97 F.3d 275, 278 (8th Cir. 1996) (internal quotation omitted).  Any misinstruction may be harmless if the evidence of guilt is overwhelming.  *See, e.g., Barnes v. United States*, 777 F.2d 430, 431 (8th Cir. 1985); *see also United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) ("[A]n erroneously given conscious avoidance instruction constitutes harmless error if the jury was charged on actual knowledge and there was 'overwhelming evidence' to support a finding that the defendant instead possessed *actual* knowledge of the fact at issue").

In this case, the Government did not argue that the alleged instructional error was harmless, and the failure to do so waives any right to such review.  *Lufkins v. Leapley*, 965 F.2d 1477, 1481 (8th Cir. 1992).  We may overlook the waiver and review the record to determine whether the error was harmless, although we will "err on the side of the criminal defendant" where the Government failed to argue harmless error.  *Id.*  Having reviewed the record, we cannot say that the evidence offered against Cacioppo with respect to her submissions to the 1290 Fund so overwhelmingly shows her guilt that any error was harmless.  Accordingly, we vacate the judgment

---

[7]Although Cacioppo moved for a judgment of acquittal in the district court, she did not argue in her appeal that she was entitled to a judgment of acquittal.

against Cacioppo on Counts 33 through 38 of the indictment. We remand for a new trial of these counts.[8]

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment of acquittal in favor of Cacioppo with respect to Counts 28 through 32. We reverse the district court's judgment of acquittal in favor of Plaskett with respect to the same counts, and we remand for the district court to consider Plaskett's motion for a new trial on those counts. We vacate the judgment against Cacioppo with respect to her convictions on Counts 33 through 38 of the indictment, and we remand the case for a new trial as to those counts.

———————————————

[8]Cacioppo also claims that the district court improperly denied Cacioppo's request for a "good faith" instruction. Because the remedy for the district court's allegedly improper refusal to give a good faith instruction would have been a new trial—something we have already granted—we leave the issue for the district court's consideration during any retrial, as the appropriateness of a good faith instruction is entirely dependent upon the evidence adduced at trial. *See, e.g., United States v. Sherer*, 653 F.3d 334, 337 (8th Cir. 1981).