Justice Kennedy,
with whom Justice Alito joins, dissenting.
The statute under consideration is the Fair Debt Collection Practices Act (FDCPA or Act), 15 U. S. C. § 1692 et seq. The statute excepts from liability a debt collector’s “bona fide error[s],” provided that they were “not intentional” and reasonable procedures have been maintained to avoid them. §1692k(c). The Court today interprets this exception to exclude legal errors. In doing so, it adopts a questionable *612 interpretation and rejects a straightforward, quite reasonable interpretation of the statute’s plain terms. Its decision aligns the judicial system with those who would use litigation to enrich themselves at the expense of attorneys who strictly follow and adhere to professional and ethical standards.
When the law is used to punish good-faith mistakes; when adopting reasonable safeguards is not enough to avoid liability; when the costs of discovery and litigation are used to force settlement even absent fault or injury; when class-action suits transform technical legal violations into windfalls for plaintiffs or their attorneys, the Court, by failing to adopt a reasonable interpretation to counter these excesses, risks compromising its own institutional responsibility to ensure a workable and just litigation system. The interpretation of the FDCPA the Court today endorses will entrench, not eliminate, some of the most troubling aspects of our legal system. Convinced that Congress did not intend this result, I submit this respectful dissent.
I
A
The FDCPA addresses “abusive debt collection practices,” § 1692(e), by regulating interactions between commercial debt collectors and consumers. See ante, at 577. The statute permits private suits against debt collectors who violate its provisions. § 1692k(a). An exception to liability is provided by the so-called bona fide error defense:
“A debt collector may not be held liable in any action... if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.” § 1692k(c).
*613 This language does not exclude mistakes of law and is most naturally read to include them. Certainly a mistaken belief about the law is, if held in good faith, a “bona fide error” as that phrase is normally understood. See Black’s Law Dictionary 582 (8th ed. 2004) (defining “error” as “a belief that what is false is true or that what is true is false,” def. 1); ibid, (“[a] mistake of law or of fact in a tribunal’s judgment, opinion, or order,” def. 2); ibid, (listing categories of legal errors).
The choice of words provides further reinforcement for this view. The bona fide error exception in §1692k(c) applies if “the violation was not intentional and resulted from a bona fide error.” The term “violation” specifically denotes a legal infraction. See id., at 1600 (“An infraction or breach of the law; a transgression,” def. 1). The statutory term “violation” thus stands in direct contrast to other provisions of the FDCPA that describe conduct itself. This applies both to specific terms, e. g., § 1692e (“A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt”), and to more general ones, e. g., § 1692k(e) (referring to “any act done or omitted in good faith”). By linking the mens rea requirement (“not intentional”) with the word “violation” — rather than with the conduct giving rise to the violation — the Act by its terms indicates that the bona fide error exception applies to legal errors as well as to factual ones.
The Court’s precedents accord with this interpretation. Federal statutes that link the term “violation” with a mens rea requirement have been interpreted to excuse good-faith legal mistakes. See, e. g., McLaughlin v. Richland Shoe Co., 486 U. S. 128, 129, 133 (1988) (the phrase “ ‘arising out of a willful violation’ ” in the Fair Labor Standards Act applies where an employer “either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute”); Trans World Airlines, Inc. v. Thurston, 469 *614 U. S. 111, 125, 126 (1985) (damages provision under the Age Discrimination in Employment Act of 1967, which applies “only in cases of willful violations,” creates liability where an employer “knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADE A” (internal quotation marks omitted)); cf. Liparota v. United States, 471 U. S. 419, 428 (1985) (prohibition on use of food stamps “ ‘knowing [them] to have been received ... in violation of’” federal law “undeniably requires a knowledge of illegality” (emphasis deleted)). The FDCPA’s use of “violation” thus distinguishes it from most of the authorities relied upon by the Court to demonstrate that mistake-of-law defenses are disfavored. See, e.g., ante, at 581-583 (citing Kolstad v. American Dental Assn., 527 U. S. 526 (1999)).
The Court’s response is that there is something distinctive about the word “willful” that suggests an excuse for mistakes of law. This may well be true for criminal statutes, in which the terms “ ‘knowing,’ ‘intentional,’ [and] ‘willful’ ” have been distinguished in this regard. Ante, at 585 (citing Safeco Ins. Co. of America v. Burr, 551 U. S. 47, 57 (2007)). But this distinction is specific to the criminal context:
“It is different in the criminal law. When the term ‘willful’ or ‘willfully’ has been used in a criminal statute, we have regularly read the modifier as limiting liability to knowing violations. This reading of the term, however, is tailored to the criminal law, where it is characteristically used to require a criminal intent beyond the purpose otherwise required for guilt, or an additional ‘“bad purpose,”’ or specific intent to violate a known legal duty created by highly technical statutes.” Id., at 57-58, n. 9 (citations omitted).
For this reason, the Court’s citation to criminal cases, which are themselves inconsistent, see Ratzlaf v. United States, 510 U. S. 135 (1994), is unavailing. See ante, at 585-586, and n. 7.
*615 In the civil context, by contrast, the word “willful” has been used to impose a mens rea threshold for liability that is lower, not higher, than an intentionality requirement. See Safeco, supra, at 57 (“[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well”). Avoiding liability under a statute aimed at intentional violations should therefore be easier, not harder, than avoiding liability under a statute aimed at willful violations. And certainly there is nothing in Thurston or McLaughlin— both civil cases — suggesting that they would have come out differently had the relevant statutes used “intentional violation” rather than “willful violation.”
B
These considerations suffice to show that § 1692k(e) is most reasonably read to include mistakes of law. Even if this were merely a permissible reading, however, it should be adopted to avoid the adverse consequences that must flow from the Court’s contrary decision. The Court’s reading leads to results Congress could not have intended.
1
The PDCPA is but one of many federal laws that Congress has enacted to protect consumers. A number of these statutes authorize the filing of private suits against those who use unfair or improper practices. See, e. g., 15 U. S. C. § 1692k (FDCPA); §1640 (Truth in Lending Act); § 1681n (Fair Credit Reporting Act); 49 U. S. C. § 32710 (federal Odometer Disclosure Act); 11 U. S. C. § 526(c)(2) (Bankruptcy Abuse Prevention and Consumer Protection Act of 2005). Several of these provisions permit a successful plaintiff to recover — in addition to actual damages — statutory damages, attorney’s fees and costs, and in some cases punitive damages. E. g., 15 U. S. C. § 1640(a)(2) (statutory damages); § 1640(a)(3) (attorney's fees and costs); § 1681n(a)(l)(B) (statu *616 tory and punitive damages); § 1681n(a)(l)(B)(3) (costs and attorney’s fees); 49 U. S. C. § 32710(a) (“3 times the actual damages or $1,500, whichever is greater”); § 32710(b) (costs and attorney’s fees); 11 U. S. C. § 526(c)(3)(A) (costs and attorney’s fees). Some also explicitly permit class-action suits. E. g., 15 U. S. C. § 1640(a)(2)(B); § 1692k(a)(2)(B).
A collateral effect of these statutes may be to create incentives to file lawsuits even where no actual harm has occurred. This happens when the plaintiff can recover statutory damages for the violation and his or her attorney will receive fees if the suit is successful, no matter how slight the injury. A favorable verdict after trial is not necessarily the goal; often the plaintiff will be just as happy with a settlement, as will his or her attorney (who will receive fees regardless). The defendant, meanwhile, may conclude a quick settlement is preferable to the costs of discovery and a protracted trial. And if the suit attains class-action status, the financial stakes rise in magnitude. See, e. g., § 1640(a)(2)(B) (class-action recovery of up to “the lesser of $500,000 or 1 per centum of the net worth of the [defendant]”); § 1692k(a)(2)(B) (same).
The present case offers an object lesson. Respondents filed a complaint in state court on behalf of a client that mistakenly believed Jerman owed money to it. Jerman’s attorney then informed respondents that the debt had been paid in full. Respondents confirmed this fact with the client and withdrew the lawsuit.
This might have been the end of the story. But because respondents had informed Jerman that she was required to dispute the debt in writing, she filed a class-action complaint. It did not matter that Jerman had claimed no harm as a result of respondents’ actions. Jerman sued for damages, attorney’s fees, and costs — including class damages of “$500,000 or 1% of defendants’ net worth whichever is less.” Amended Complaint in No. 1:06-CV-01397 (ND Ohio), p. 4. In addition to merits-related discovery, Jerman sought information from respondents concerning the income and net *617 worth of each partner in the firm. At some point, Jerman proposed to settle with respondents for $15,000 in damages and $7,500 in attorney’s fees. Amended Joint App. in No. 07-3964 (CA6), pp. 256-262. The case illustrates how a technical violation of a complex federal statute can give rise to costly litigation with incentives to settle simply to avoid attorney’s fees.
Today’s holding gives new impetus to this already troubling dynamic of allowing certain actors in the system to spin even good-faith, technical violations of federal law into lucrative litigation, if not for themselves then for the attorneys who conceive of the suit. See Federal Home Loan Mortgage Corporation v. Lamar, 503 F. 3d 504, 513 (CA6 2007) (referring to the “cottage industry” of litigation that has arisen out of the FDCPA (internal quotation marks omitted)). It is clear that Congress, too, was troubled by this dynamic. That is precisely why it enacted a bona fide error defense. The Court’s ruling, however, endorses and drives forward this dynamic, for today’s holding leaves attorneys and their clients vulnerable to civil liability for adopting good-faith legal positions later determined to be mistaken, even if reasonable efforts were made to avoid mistakes.
The Court seeks to brush aside these concerns by noting that trivial violations will give rise to little in the way of actual damages and that trial courts “have discretion in calculating reasonable attorney’s fees under [the] statute.” Ante, at 598. It is not clear, however, that a court is permitted to adjust a fee award based on its assessment of the suit’s utility. Cf. Perdue v. Kenny A, ante, at 554 (noting a “ ‘strong presumption’ ” of reasonableness that attaches to a lodestar calculation of attorney’s fees). Though the Court, properly, does not address the question here, it acknowledges that some courts have deemed fee awards to victorious plaintiffs to be “ ‘mandatory,’ ” even if the plaintiff suffered no damage. Ante, at 598, n. 16.
*618 The Court’s second response is that the FDCPA guards against abusive suits and that suits brought “ ‘in bad faith and for the purpose of harassment’ ” can lead to a fee award for the defendant. Ante, at 599 (quoting § 1692k(a)(3)). Yet these safeguards cannot deter suits based on technical— but harmless — violations of the statute. If the plaintiff obtains a favorable judgment or a settlement, then by definition the suit will not have been brought in bad faith. See Emanuel v. American Credit Exch., 870 F. 2d 805, 809 (CA2 1989) (FDCPA defendant’s “claim for malicious prosecution cannot succeed unless the action subject of the claim is unsuccessful”).
Again the present case is instructive. Jerman brought suit without pointing to any actual harm that resulted from respondents’ actions. At the time her complaint was filed, it was an open question in the Sixth Circuit whether a debt collector could demand that a debt be disputed in writing, and the district courts in the Circuit had reached different answers. Ante, at 579, n. 2. The trial court in this case happened to side with Jerman on the issue, 464 F. Supp. 2d 720, 722-725 (ND Ohio 2006), but it seems unlikely that the court would have labeled her suit “abusive” or “in bad faith” even if it had gone the other way.
There is no good basis for optimism, then, when one contemplates the practical consequences of today’s decision. Given the complexity of the FDCPA regime, see 16 CFR pt. 901 (2009) (FDCPA regulations), technical violations are likely to be common. Indeed, the Court acknowledges that they are inevitable. See ante, at 587. As long as legal mistakes occur, plaintiffs and their attorneys will have an incentive to bring suits for these infractions. It seems unlikely that Congress sought to create a system that encourages costly and time-consuming litigation over harmless violations committed in good faith despite reasonable safeguards.
When construing a federal statute, courts should be mindful of the effect of the interpretation on congressional pur *619 poses explicit in the statutory text. The FDCPA states an objective that today’s decision frustrates. The statutory purpose was to “eliminate abusive debt collection practices” and to ensure that debt collectors who refrain from using those practices “are not competitively disadvantaged.” 15 U. S. C. § 1692(e) (“Purposes”). The practices Congress addressed involved misconduct that is deliberate, see § 1692(a) (“abusive, deceptive, and unfair debt collection practices”); § 1692(c) (“misrepresentation or other abusive debt collection practices”), or unreasonable, see §1692c(a)(l) (prohibiting debt collectors from communicating with debtors at times “which should be known” to be inconvenient); § 1692e(8) (prohibiting the communication of credit card information “which should be known to be false”). That explains the statutory objective not to disadvantage debt collectors who “refrain” from abusive practices — that is to say, debt collectors who do not intentionally or unreasonably adopt them. It further explains why Congress included a good-faith error exception, whieh exempts violations that are not intentional or unreasonable.
In referring to “abusive debt collection practices,” however, surely Congress did not contemplate attorneys who act based on reasonable, albeit ultimately mistaken, legal interpretations. A debt collector does not gain a competitive advantage by making good-faith legal errors any more than by making good-faith factual errors. This is expressly so if the debt collector has implemented “procedures reasonably adapted to avoid” them. By reading §1692k(c) to exclude good-faith mistakes of law, the Court fails to align its interpretation with the statutory objectives.
The Court urges, nevertheless, that there are policy concerns on the other side. The Court frets about debt collectors who “press the boundaries of the Act’s prohibitions” and about a potential “‘race to the bottom.’” Ante, at 602 (quoting Brief for Petitioner 32). For instance, in its view, interpreting §1692k(c) to encompass legal mistakes might *620 mean that “nonlawyer debt collectors could obtain blanket immunity for mistaken interpretations of the FDCPA simply by seeking the advice of legal counsel.” Ante, at 602. It must be remembered, however, that § 1692k(e) may only be invoked where the debt collector’s error is “bona fide” and where “reasonable procedures” have been adopted to avoid errors. There is no valid or persuasive reason to assume that Congress would want to impose liability on a debt collector who relies in good faith on the reasonable advice of counsel. If anything, we should expect Congress to think that such behavior should be encouraged, not discouraged.
The Court also suggests that reading § 1692k(e) to include legal errors would encourage litigation over a number of issues: what subjective intent is necessary for liability; what procedures are necessary to avoid legal mistakes; what standard applies to procedures adopted by attorney debt collectors as compared to nonattorney debt collectors. Yet these questions are no different from ones already raised by the statute. Whether the debt collector is an attorney or not, his or her subjective intent must be assessed before liability can be determined. Procedures to avoid mistakes— whether legal or otherwise — must be “reasonable,” which is always a context-specific inquiry. The Court provides no reason to think that legal errors raise concerns that differ in these respects from those raised by nonlegal errors.
2
There is a further and most serious reason to interpret § 1692k(c) to include good-faith legal mistakes. In Heintz v. Jenkins, 514 U. S. 291 (1995), the Court held that attorneys engaged in debt-collection litigation may be “debt collectors” for purposes of the FDCPA. In reaching this conclusion the Court confronted the allegation that its interpretation would produce the anomalous result that attorneys could be liable for bringing legal claims against debtors if those claims ultimately proved unsuccessful. Id., at 295. The Court re *621 jected this argument. In doing so it said that § 1692k(c) provides debt collectors with a defense for their bona fide errors. Id., at 295.
Today the Court relies on Heintz to allay concerns about the practical implications of its decision. Ante, at 599-600. Yet the Court reads § 1692k(c) to exclude mistakes of law, thereby producing the very result that Heintz said would not come about. Attorneys may now be held liable for taking reasonable legal positions in good faith if those positions are ultimately rejected.
Attorneys are dutybound to represent their clients with diligence, creativity, and painstaking care, all within the confines of the law. When statutory provisions have not yet been interpreted in a definitive way, principled advocacy is to be prized, not punished. Surely this includes offering interpretations of a statute that are permissible, even if not yet settled. The FDCPA is a complex statute, and its provisions are subject to different interpretations. See, e.g., ante, at 580-581, n. 4 (identifying splits of authority on two different FDCPA issues); Brief for National Association of Retail Collection Attorneys as Amicus Curiae 5-6 (identifying another split); see also ante, at 587. Attorneys will often find themselves confronted with a statutory provision that is susceptible to different but still reasonable interpretations.
An attorney’s obligation in the face of uncertainty is to give the client his or her best professional assessment of the law’s mandate. Under the Court’s interpretation of the FDCPA, however, even that might leave the attorney vulnerable to suit. For if the attorney proceeds based on an interpretation later rejected by the courts, today’s decision deems that to be actionable as an intentional “violation,” with personal financial liability soon to follow. Indeed, even where a particular practice is compelled by existing precedent, the attorney may be sued if that precedent is later overturned.
*622 These adverse consequences are evident in the instant case. When respondents filed a foreclosure complaint against Jerman on behalf of their client, they had no reason to doubt that the debt was valid. They had every reason, furthermore, to believe that they were on solid legal ground in asking her to dispute the amount owed in writing. See, e. g., Graziano v. Harrison, 950 F. 2d 107, 112 (CA3 1991) (written objection is necessary for coherent statutory scheme and protects the debtor by “creating] a lasting record of the fact that the debt has been disputed”). When Jerman disputed the debt, respondents verified that the debt had been satisfied and withdrew the lawsuit. Respondents acted reasonably at every step, and yet may still find themselves liable for a harmless violation.
After today’s ruling, attorneys can be punished for advocacy reasonably deemed to be in compliance with the law or even required by it. This distorts the legal process. Henceforth, creditors’ attorneys of the highest ethical standing are encouraged to adopt a debtor-friendly interpretation of every question, lest the attorneys themselves incur personal financial risk. It is most disturbing that this Court now adopts a statutory interpretation that will interject an attorney’s personal financial interests into the professional and ethical dynamics of the attorney-client relationship. These consequences demonstrate how untenable the Court’s statutory interpretation is and counsel in favor of a different reading. See Milavetz, Gallop & Milavetz, P. A. v. United States, ante, at 246, n. 5 (rejecting a reading of federal law that “would seriously undermine the attorney-client relationship”).
The Court’s response is that this possibility is nothing new, because attorneys are already dutybound to comply with the law and with standards of professional conduct. Attorneys face sanctions for harassing behavior and frivolous litigation, and in some cases misconduct may give rise to personal liability. Ante, at 600-601.
*623 This response only underscores the problem with the Court’s approach. By reading § 1692k(c) to exclude mistakes of law, the Court ensures that attorneys will face liability even when they have done nothing wrong — indeed, even when they have acted in accordance with their professional responsibilities. Here respondents’ law firm did not harass Jerman; it did not file a frivolous suit against her; it did not intentionally mislead her; it caused her no damages or injury. The firm acted upon a reasonable legal interpretation that the District Court later thought to be mistaken. The District Court’s position, as all concede, was in conflict with other published, reasoned opinions. Ante, at 579, n. 2. (And in the instant case, neither the Court of Appeals nor this Court has decided the issue. See ante, at 580, n. 3.) If the law firm can be punished for making a good-faith legal error, then to be safe an attorney must always stick to the most debtor-friendly interpretation of the statute, lest automatic liability follow if some later decision adopts a different rule. This dynamic creates serious concerns, not only for the attorney-client relationship but also for First Amendment rights. Cf. Legal Services Corporation v. Velazquez, 531 U. S. 533, 545 (2001) (law restricting arguments available to attorneys “prohibits speech and expression upon which courts must depend for the proper exercise of the judicial power”). We need not decide that these concerns rise to the level of an independent constitutional violation, see ante, at 604, n. 21, to recognize that they counsel against a problematic interpretation of the statute. See Edward J. De Bartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council, 485 U. S. 568, 575 (1988) (“[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress”).
Justice Breyer — although not the Court — argues that an attorney faced with legal uncertainty only needs to turn *624 to the Federal Trade Commission (FTC) for an advisory opinion. An attorney’s actions in conformity with the opinion will be shielded from liability. Ante, at 605 (concurring opinion) (citing 15 U. S. C. § 1692k(e)). This argument misconceives the practical realities of litigation. Filings and motions are made under pressing time constraints; arguments must be offered quickly in reply; and strategic decisions must be taken in the face of incomplete information. Lawyers in practice would not consider this alternative at all realistic, particularly where the defense is needed most.
And even were there time to generate a formal request to the FTC and wait an average of three or four months for a response (assuming the FTC responds at all), the argument assumes that an ambiguity in the statute is obvious, not latent, that the problem is at once apparent, and that a conscious decision to invoke FTC procedures can be made. But the problem in many instances is that interpretive alternatives are not at once apparent. All this may explain why, in the past decade, the FTC has issued only four opinions in response to just seven requests. See Tr. of Oral Arg. 27-28, 30. The FTC advisory process does not remedy the difficulties that the Court’s opinion will cause.
Even if an FTC opinion is obtained, moreover, the ethical dilemma of counsel is not resolved. If the FTC adopts a position unfavorable to the client, the attorney may still believe the FTC is mistaken. Yet under today’s decision, the attorney who in good faith continues to assert a reasonable position to the contrary does so at risk of personal liability. This alters the ethical balance central to the adversary system; and it is, again, a reason for the Court to adopt a different, but still reasonable, interpretation to avoid systemic disruption.
II
The Court does not assert that its interpretation is clearly commanded by the text. Instead, its decision relies on an *625 amalgam of arguments that, taken together, are said to establish the superiority of its preferred reading. This does not withstand scrutiny.
First, the Court relies on the maxim that “ ‘ignorance of the law will not exeuse any person, either civilly or criminally.’” Ante, at 581 (quoting Barlow v. United States, 7 Pet. 404, 411 (1833)). There is no doubt that this principle “is deeply rooted in the American legal system.” Cheek v. United States, 498 U. S. 192, 199 (1991). Yet it is unhelpful to the Court’s position. The maxim the Court cites is based on the premise “that the law is definite and knowable,” so that all must be deemed to know its mandate. Ibid. See also O. Holmes, The Common Law 48 (1881) (“[T]o admit the excuse [of ignorance] at all would be to encourage ignorance where the law-maker has determined to make men know and obey”). In other words, eitizens cannot avoid compliance with the law simply by demonstrating a failure to learn it.
The most straightforward application of this principle is to statutory provisions that delineate a category of prohibited conduct. These statutes will not be read to excuse legal mistakes absent some indication that the legislature meant to do so. See, e. g., Armour Packing Co. v. United States, 209 U. S. 56, 70, 85-86 (1908) (rejecting the defendant’s attempt to read a mistake-of-law defense into a criminal statute forbidding shippers to “obtain or dispose of property at less than the regular rate established”); ante, at 583 (discussing a federal statute imposing liability for “‘intentional discrimination’ ”).
In the present case, however, the Court is not asked whether a mistake of law should excuse respondents from a general prohibition that would otherwise cover their conduct. Rather, the issue is the scope of an express exception to a general prohibition. There is good reason to think the distinction matters. It is one thing to presume that Congress does not intend to create an exception to a general rule through silence; it is quite another to presume that an ex *626 plicit statutory exception should be confined despite the existence of other sensible interpretations. Cf. Kosak v. United States, 465 U. S. 848, 853-854, n. 9 (1984) (although the Federal Tort Claims Act waives sovereign immunity, “the proper objective of a court attempting to construe [an exception to the Act] is to identify those circumstances which are within the words and reason of the exception — no less and no more” (internal quotation marks omitted)). This is all the more true where the other possible interpretations are more consistent with the purposes of the regulatory scheme. By its terms, § 1692k(c) encompasses — without limitation — all violations that are “not intentional and resulft] from a bona fide error.” The Court provides no reason to read this language narrowly.
The Court responds that “our precedents have made clear for more than 175 years” that the presumption against mistake-of-law defenses applies even to explicit statutory exceptions. Ante, at 582, n. 5. By this the Court means that one case applied the presumption to an exception more than 175 years ago. In Barlow, the Court declined to excuse an alleged mistake of law despite a statutory provision that excepted “false denomination^]... [that] happened by mistake or accident, and not from any intention to defraud the revenue.” 7 Pet., at 406. In construing this language, the Barlow Court noted that it demonstrated congressional intent to exclude mistakes of law:
“The very association of mistake and accident, in this [connection], furnishes a strong ground to presume that the legislature had the same classes of cases in view____ Mistakes in the construction of the law, seem as little intended to be excepted by the proviso, as accidents in the construction of the law.” Id., at 411-412.
Unlike the provision at issue in Barlow, § 1692k(c) gives no indication that its broad reference to “bona fide error[s]” was meant to exclude legal mistakes.
*627 Even if statutory exceptions should normally be construed to exclude mistakes of law, moreover, that guideline would only apply absent intent to depart from the general rule. There is no doubt that Congress may create a mistake-of-law defense; the question is whether it has done so here. See Ratzlaf, 510 U. S., at 149. As explained above, see Part I-A, supra, Congress has made its choice plain by using the word “violation” in § 1692k(e) to indicate that mistakes of law are to be included.
Second, the Court attempts to draw a contrast between §1692k(c) and the administrative penalties in the Federal Trade Commission Act (FTC Act), 38 Stat. 717, 15 U. S. C. §41 et seq. Under the FTC Act, a debt collector may face civil penalties of up to $16,000 per day for acting with “actual knowledge or knowledge fairly implied on the basis of objective circumstances that [an] act is” prohibited under the FDCPA. §§45(m)(l)(A), (C); 74 Fed. Reg. 858 (2009) (amending 16 CFR § 1.98(d) (2009)). The Court reasons that the FTC. provision is meant to provide relatively harsh penalties for intentional violations. By contrast, the argument continues, the penalties in the FDCPA itself must cover— and hence §1692k(c) must not excuse — unintentional violations. Ante, at 583-584.
The argument rests on a mistaken premise — namely, that § 1692k(c) must immunize all legal errors or none. This misreads the statute. As the text states, it applies only to “bona fide” errors committed despite “the maintenance of procedures reasonably adapted to avoid” these mistakes. So under a sensible reading of the statute, (1) intentional violations are punishable under the heightened penalties of the FTC Act; (2) unintentional violations are generally subject to punishment under the FDCPA; and (3) a defendant may escape liability altogether by proving that a violation was based on a bona fide error and that reasonable error-prevention procedures were in place. There is nothing incongruous in this scheme. Indeed, for the reasons described *628 in Part I, supra, it is far less peculiar than the Court’s reading, which would subject attorneys to liability for good-faith legal advocacy, even advocacy based on an accurate assessment of then-existing ease law.
Third, in construing § 1692k(c) to exclude legal errors, the Court points to the requirement that a debt collector maintain “procedures reasonably adapted to avoid any such error.” The Court asserts that this phrase most naturally evokes procedures to avoid clerical or factual mistakes. There is nothing natural in reading this phrase contrary to its plain terms, which do not distinguish between different categories of mistakes. Nor is there anything unusual about procedures adopted to avoid legal mistakes. The present case is again instructive. According to the District Court, respondents designated a lead FDCPA compliance attorney, who regularly attended conferences and seminars; subscribed to relevant periodicals; distributed leading FDCPA cases to all attorneys; trained new attorneys on their statutory obligations; and held regular firmwide meetings on FDCPA issues. See 538 F. 3d 469, 477 (CA6 2008). These procedures are not only “reasonably adapted to avoid [legal] error[s],” but also accord with the FDCPA’s purposes.
The Court argues, nonetheless, that the statute contemplates only clerical or factual errors, for these are the type of errors that can mostly naturally be addressed through “ ‘a series of steps followed in a regular orderly definite way.’” Ante, at 587 (quoting Webster’s Third New International Dictionary 1807 (1976)). As made clear by the steps that respondents have taken to ensure FDCPA compliance, this is simply not true. The Court also speculates that procedures to avoid clerical or factual errors will be easier to implement than procedures to avoid legal errors. Even if this were not pure conjecture, it has nothing to do with what the statute requires. The statute does not talk about procedures that eliminate all — or even most — errors. It merely requires procedures “reasonably adapted to avoid any such error.” *629 The statute adopts the sensible approach of requiring reasonable safeguards if liability is to be avoided. This approach, not the Court’s interpretation, reflects the reality of debt-collection practices.
Fourth, the Court argues that construing § 1692k(e) to encompass a mistake-of-law defense “is at odds with” the role contemplated for the FTC. Ante, at 588. This is so, it contends, because the FTC is authorized to issue advisory opinions, and the statute shields from liability “any act done or omitted in good faith in conformity” with such opinions. § 1692k(e). But why, asks the Court, would a debt collector seek an opinion from the FTC if immunity under § 1692k(e) could be obtained simply by relying in good faith on advice from private counsel? Going further, the Court suggests that debt collectors might “have an affirmative incentive not to seek an advisory opinion to resolve ambiguity in the law, as receipt of such advice would prevent them from claiming good-faith immunity for violations.” Ante, at 588.
There is little substance to this line of reasoning. As the Court itself acknowledges, debt collectors would have an incentive to invoke the FTC safe harbor even if § 1692k(c) is construed to include a mistake-of-law defense, because the safe harbor provides a “more categorical immunity.” Ante, at 588, n. 8. Additionally, if a debt collector avoids seeking an advisory opinion from the FTC out of concern that the answer will be unfavorable, that seems quite at odds with saying that his.or her ignorance is “bona fide.”
It should be noted further that the Court’s concern about encouraging ignorance could apply just as well to § 45(m)(l)(A). That provision subjects a debt collector to harsh penalties for violating an FTC rule “with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule.” No one contends that this will encourage debt collectors to avoid learning the FTC’s rules. *630 Yet there is no doubt that §45(m)(l)(A) permits a mistake-of-law defense.
All this assumes, of course, that obtaining an FTC advisory opinion will be a reasonably practical possibility. For the reasons stated above, see Part I-B-2, supra, this is to be doubted. Even the Court recognizes the limited role that the FTC has played. Ante, at 599 (“[E]vidence of present administrative practice makes us reluctant to place significant weight on § 1692k(e) as a practical remedy”).
Fifth, the Court asserts that “[a]ny remaining doubt” about its preferred interpretation is dispelled by the FDCPA’s statutory history. Ante, at 588. The Court points to the fact that § 1692k(c) mirrors a bona fide error defense provision in the earlier enacted Truth in Lending Act (TILA), arguing that Congress sought to incorporate into the FDCPA the view of the Courts of Appeals that the TILA defense applied only to clerical errors. Ante, at 588-590. As Justice Scalia points out, the Court’s claims of judicial uniformity are overstated. See ante, at 607 (opinion concurring in part and concurring in judgment). They rest on three Court of Appeals decisions, which are contradicted by several District Court opinions and a State Supreme Court opinion — hardly a consistent legal backdrop against which to divine legislative intent. The Court also ignores the fact that those three Courts of Appeals had construed the TILA provision to apply only to clerical errors. See Ives v. W. T. Grant Co., 522 F. 2d 749, 758 (CA2 1975); Haynes v. Logan Furniture Mart, Inc., 503 F. 2d 1161, 1167 (CA7 1974); Palmer v. Wilson, 502 F. 2d 860, 861 (CA9 1974). The Court therefore cannot explain why it reads § 1692k(c) more broadly to encompass factual mistakes as well.
It is of even greater significance that in 1980 Congress amended the TILA’s bona fide error exception explicitly to exclude “an error of legal judgment with respect to a person’s obligations under [the TILA].” See Truth in Lending Simplification and Reform Act, § 615(a), 94 Stat. 181. This *631 amendment would have been unnecessary if Congress had understood the pre-1980 language to exclude legal errors. The natural inference is that the preamendment TILA language — the same language later incorporated nearly verbatim into §1692k(c) — was understood to cover those errors.
The Court's responses to this point are perplexing. The Court first says that the 1980 amendment did not “obviously]'' change the scope of the TILA’s bona fide error defense, given the “uniform interpretation]” that the defense had been given in the Courts of Appeals. Ante, at 591. The Court thus prefers to make an entire statutory amendment surplusage rather than abandon its dubious assumption that Congress meant to ratify a nascent Court of Appeals consensus. Cf. Corley v. United States, 556 U. S. 303, 314 (2009) (“[O]ne of the most basic interpretive canons [is] that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant” (internal quotation marks omitted)). (Without any evidence, the Court speculates that perhaps the amendment was intended to codify existing judicial interpretations that excluded legal errors. Ante, at 592. If those judicial interpretations were truly as uniform as the Court suggests — and the presumption against mistake-of-law defenses as ironclad — there would have been no need for such a recodification.)
The Court is hesitant as well to give the 1980 amendment weight because Congress “has not expressly included mistakes of law in any of the numerous bona fide error defenses, worded in pertinent part identically to § 1692k(c), elsewhere in the U. S. Code.” Ante, at 593 (emphasis in original). In other words, the Court refuses to read § 1692k(c) to cover mistakes of law because other bona fide error statutes do not expressly refer to such mistakes. But the reverse should be true: If other bona fide error provisions included mistake-of-law language but § 1692k(c) did not, we might think that the omission in §1692k(c) signaled Congress' intent to exclude *632 mistakes of law. The absence of mistake-of-law language in §1692k(e) is consequently less noteworthy because other statutes also omit such language.
The Court emphasizes that some bona fide error defenses, like the one in the current version of the TILA, expressly exclude legal errors from their scope. Ante, at 592-593 (citing 12 U. S. C. § 4010(c)(2)). Yet this also can prove the opposite of what the Court says it does: If a bona fide error defense were generally assumed not to include legal mistakes (as the Court argues), there would be no need to expressly exclude them. It is only if the defense would otherwise include such errors that exclusionary language becomes necessary. By writing explicit exclusionary language into the TILA (and some other federal provisions), Congress has indicated that those provisions would otherwise cover good-faith legal errors.
* * *
For these reasons, §1692k(c) is best read to encompass mistakes of law. I would affirm the judgment of the Court of Appeals.